24

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FILED

MAR 2 9 2005

CLERK'S OFFICE
DETROIT

JESUS R. GARCIA,

        Petitioner,

v.

THOMAS BIRKETT,

        Respondent.

_____/

CASE NO. 03-CV-74659-DT
JUDGE ROBERT H. CLELAND
MAGISTRATE JUDGE PAUL J. KOMIVES

## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION ................................................................ 1
II.    REPORT ........................................................................ 1
    A.    *Procedural History* ...................................................... 1
    B.    *Factual Background Underlying Petitioner's Conviction* ..................... 3
    C.    *Standard of Review* ..................................................... 12
    D.    *Prosecutorial Misconduct (Claim I)* ..................................... 14
        1.    *Prosecutorial Misconduct* ........................................ 14
        2.    *Ineffective Assistance* .......................................... 17
    E.    *Evidence Claims (Claims II & III)* ...................................... 18
        1.    *Clearly Established Law* .......................................... 18
        2.    *Authentication of Letter* ........................................ 19
        3.    *Other Acts Evidence* ............................................. 20
    F.    *Lesser Included Offense Instruction (Claim IV)* ......................... 21
        1.    *Clearly Established Law* .......................................... 22
        2.    *Analysis* ........................................................ 22
    G.    *Conclusion* ............................................................ 23
III.   NOTICE TO PARTIES REGARDING OBJECTIONS ...................................... 23

      *   *   *   *   *

I.     **RECOMMENDATION:** The Court should deny petitioner's application for the writ of

habeas corpus.

II.    **REPORT:**

A.    *Procedural History*

        1.    Petitioner Jesus R. Garcia is a state prisoner, currently confined at the Ionia Maximum

Correctional Facility in Ionia, Michigan.

    2.    On September 15, 1999, petitioner was convicted of one count of second degree murder, MICH. COMP. LAWS § 750.317; and one count of conspiracy to commit first degree murder, MICH. COMP. LAWS §§ 750.157a, .316, following a jury trial in the Wayne County Circuit Court. On November 8, 1999, he was sentenced to a two concurrent terms of 30-60 years' imprisonment.

    3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

    I.    MR. GARCIA WAS DENIED DUE PROCESS OF LAW AND/OR EFFECTIVE ASSISTANCE OF COUNSEL, WHERE THE PROSECUTOR IMPROPERLY BOLSTERED THE CREDIBILITY OF KEY WITNESS RICKY O'NEAL, BY ELICITING FALSE TESTIMONY FROM O'NEAL AND MISSTATING THE LAW REGARDING WHETHER O'NEAL HAD TO GIVE INCRIMINATING TESTIMONY AGAINST MR. GARCIA TO PRESERVE HIS EXTREMELY FAVORABLE PLEA BARGAIN.

    II.    MR. GARCIA WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE TRIAL COURT ALLOWED RICKY O'NEAL TO "AUTHENTICATE" A THREATENING LETTER AS HAVING BEEN WRITTEN BY MR. GARCIA, WHEN A STATE POLICE HANDWRITING EXPERT COULD NOT EVEN DO SO, AND WHERE THE BASIS FOR O'NEAL'S ABILITY TO IDENTIFY MR. GARCIA'S HANDWRITING WAS HIGHLY QUESTIONABLE.

    III.    MR. GARCIA WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL, WHERE THE PROSECUTOR AND/OR HIS WITNESSES: 1) TOLD THE JURY THAT MR. GARCIA HAD PREVIOUSLY BEEN IN PRISON; 2) TOLD THE JURY THAT MR. GARCIA HAD KILLED AND HAD BEEN ARRESTED FOR THE KILLING OF ANOTHER GANG MEMBER; AND 3) VIOLATED A PRETRIAL ORDER PREVENTING EVIDENCE THAT MR. GARCIA HAD ALLEGEDLY ORDERED OTHER DRIVE-BY SHOOTINGS.

    IV.    MR. GARCIA WAS DENIED HIS RIGHT TO INSTRUCTIONS ON LESSER INCLUDED OFFENSES, WHERE THE COURT REFUSED TO INSTRUCT THE JURY ON FELONIOUS ASSAULT AS A LESSER OFFENSE OF MURDER, OR CONSPIRACY TO COMMIT FELONIOUS ASSAULT AS A LESSER OFFENSE OF CONSPIRACY TO COMMIT

2

FIRST-DEGREE MURDER.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Garcia*, No. 224955, 2002 WL 499458 (Mich. Ct. App. Apr. 2, 2002) (per curiam).

4.      Petitioner sought leave to appeal these four issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Garcia*, 655 N.W.2d 555 (Mich. 2002).

5.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on November 20, 2003. As grounds for the writ of habeas corpus, he raises the four claims that he raised in the state courts.

6.      Respondent filed his answer on June 1, 2004. He contends that petitioner's first claim is barred by petitioner's procedural default in the state courts, and that the remaining claims are either not cognizable or without merit.

7.      Petitioner filed a brief in support of his petition, in the nature of a reply to respondent's answer, on August 5, 2004..

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction stems from the shooting death of Joane Georgescu in Detroit on the night of October 12-13, 1996. The prosecution's theory of the case was that petitioner, as the leader of a gang called the Cobras, ordered a drive-by shooting directed at a rival gang known as the Street Boys. The shooting was carried out by two Cobra gang members, David "Sonic" Eddleman and Richard "Kato" Glockens. Georgescu was not the intended target, but was a bystander who was shot when the two opened-fire on the Street Boys. The voluminous trial testimony was accurately summarized in petitioner's state court brief on appeal:

3

On the night of October 12-13, 1996, Joane Georgescu went to the White Star Nightclub with a group from her neighborhood in southwest Detroit. Ruben Cosma gave her and four others a ride back to the neighborhood in his Chevy Corsica after the club closed. When they got back near their neighborhood, Tabitha Bogde saw a car behind them, with 3 or 4 people inside, throwing a gang sign, the letter "C", at their car. She might have told Cosma that it looked like the Crips or Cash Flow, but said she did not really know gang sings. Cosma dropped his passengers off near the corner of Trenton and Kirkwood, near the house of their friend Florin Bobick, where a group of about 15 to 30 friends were socializing, mostly outside (II 79-83, 88, 94, 105-9, 115-6, 118, 132-4, 139-42, 144-7). Cosma said Tabitha Bogde at some point told him "there go the guys we saw flashing the gang sings." Cosma thought he saw a car in his mirror. Tabitha Bogde saw the headlights of the car turning into an alley (II 97-103, 119-22).

The group there were of Romanian background. A number of them had heard that a few weeks earlier there was a fight between some Romanian men, including Florin Bobick, and others from the area, possibly members of the Cash Flow (II 102, 135, 142-3, 161-3).

Several minutes later, while Mr. Cosma was still in his car, they heard gunshots. His car was north on Trenton and the shots were coming from behind him. Felicia Bogde said the shots were coming from the alley off Trenton. Tabitha and Felicia Bogde jumped in the front seat, and Joane Georgescu got in the back (II 83-5, 88, 81, 110-2, 114, 119, 135-9). They could not see who fired the shots (II 113, 135-9). Once Cosma realized someone was shooting at his car, he drove off (II 85-6). When Tabitha Bogde jumped into the backseat she realized that Joane Georgescu had been shot (II 112, 136). Cosma tried to rush her to the hospital. On the way there, police pulled him over for going through a red light. He told them what happened, and they took Ms. Georgescu to the hospital (II 86-7, 112-3, 140, 171-5).

As Flaviu Forgaciu had exited Cosma's car to relieve himself in an alley off Trenton, a car pulled up on Trenton and stopped near the intersection with the alley (II 147-50). The car was a four-door GM-type car like a Chevrolet, which was dark blue, black or brown (II 159-60). He noticed an AK military rifle pointing out the front passenger window. He ran toward people at the corner of Trenton and Kirkwood, yelling that there was a car with a rifle (II 150-2). He saw the car pull into the alley. Forgaciu and his friend Dino ran back to the alley to see what happened to the car. It stopped down the alley for a few seconds, then pulled into reverse, and started coming toward them (II 152-4). They jumped over a fence and lay on the ground. They heard the car pass by and then heard 8 to 12 shots, coming from the intersection of the alley and Trenton. A minute after the shots stopped, the looked in the alley, but the car was no longer there. As they went back toward Trenton and Kirkwood, Forgaciu noticed cars had been shot at and people were coming out of Florin Bobick's house, which had also been shot at (II 155-9).

Officer Carmen Diaz found two or three spent .30 caliber cartridge casings in the alley off Trenton. Florin Bobick also picked up some casings and turned them over to police (II 177-82; IV 124-5). Police also observed four bullet holes in the

4

interior of Bobick's house and retrieved one spent bullet from the interior archway of the house (IV 124-5). There was a bullet hole in the trunk of Cosma's car and a second hole in the rear passenger seat that appeared to be cause by the same round. A spent bullet was found on the rear passenger seat. There was also a bullet hole that entered the inside of the rear passenger door when it was open, and went out that door (IV 125-6, 129; II 89, 165-9). The spent casings were fired from the same .30 caliber weapon. The two spent bullets were fired from the same .30 caliber weapon as one another. However, it could not be determined whether those spent casings and bullets were fired from the same weapon. .30 caliber ammunition is used in M-1 carbines (V 109-11).

Dr. Yung Chung, from the Wayne County Medical Examiner's Office, performed an autopsy on Joane Georgescu. The cause of death was a single gunshot wound, which entered the right side of her back and exited in the right upper chest (II 127-31).

Thomas Valastek testified that he joined the Cobras in 1991 or 1992, but first met Mr. Garcia in the summer of 1996: "He had approached me and some friends one day when he got out of jail." Mr. Garcia was referred to as "King Chuii," because he was leader of the Cobras. Before Mr. Garcia came along, the Cobras had only 10-15 members, and were "falling apart" (III 33-40, 104). Mr. Garcia helped unite the east-side Cobras with the southwest Cobras (III 161-2, 167). Once Mr. Garcia took over, things got more organized and the gang became stronger. There were regular meetings, usually on Chopin St. (III 40-2, 82-3). Meetings would start off with prayers concerning being a Cobra. Members would then pay $10 a week dues. After dues were paid, Mr. Garcia would address issues relating to the gang. Mr. Garcia ran the meetings, but is someone else had something to say Mr. Garcia would let them. The Cobras' prayers and laws were written down; they originated in Chicago. They followed the rules in the book, and what Mr. Garcia said (III 42-5, 83, 86-8). Valastek said if someone did not follow the law, the would get a "V" (violation), which would result in being beaten by other members for ½ to 2 minutes. After the business of the meeting, they would socialize (III 45-6).

Cobras would "throw up" a "C", diamond, or Cobra sign to say they were members of the Cobras (III 50-1, 58-9, 75-6, 111, 169-71). Members would "throw down" opposing gangs' signs to show them disrespect (III 77). Brian Weaver testifed that the Cash Flow would throw up signs of tepees and something like a "C"" (III 169-71). Officer Angelo Nardoni testified although the Crips gang also used a "C", they were not really active in Detroit (V 104).

Valastek said Mr. Garcia had the rank of "King." Among the next ranks were "Don Bird" and "Prince Papo." Lieutenants were below them. Sergeants included Rich "Viper" Hagerman and David "Sonic" Eddleman (III 64, 68-9). Weaver said "the Table" would decide what to do, but Mr. Garcia ultimately gave the orders (III 164-6, 172).

When asked if he knew Prince Papo before 1996, Valastek replied "Yes. He used to be the leader before Chuii got out." (III 65). Defense counsel lodged a continuing objection at side-bar to any reference to Defendant having been in prison

(III 85).

Brian Weaver said that Cobra rules and laws came from Chicago, but that Mr. Garcia had a say over what the laws meant and whether someone broke them. The Cobras had a code of silence, where they didn't discuss business with outsiders or police (III 90-1, 94, 97-8, 168). Weaver said if they did, they would get a violation, as determined by "the Table," but that Mr. Garcia ran "the Table" (III 166, 173). The rules stated that when taking care of organization business, to be sure to dispose of all incriminating evidence (IV 24). They also said "Four to the sky, five must die." "Four" referred to the Cobras; "five" meant rival gangs, such as Street Boys Incorporated (SBI's) and Cash Flow (III 91-2, 164, 167). The rule book also said that "I will abide by all commands given to me by my president or vice-president (III 96; IV 25).

Valastek said the night Joane Georgescu was shot, he got drunk at a bar with 10-15 Cobras, including Defendant. He claimed that at one point at the bar, Defendant said he wanted someone to do a mission, which meant a "drive-by shooting." He said Mr. Garcia did not talk about it anymore or say who was going to go. They later went to the house on Chopin. When Valastek got there, he passed out, and ended up staying over. He said the next morning Mr. Garcia told him a girl had been shot last night. He said later that day at a meeting, Mr. Garcia said it was "Sonic" who did the drive-by, and gave Sonic praise for doing so (III 99-103).

On cross-examination, Valastek was impeached with prior testimony (which he adopted at Mr. Garcia's trial) stating that the night Mr. Garcia allegedly ordered the mission, he watched the first Tyson-Holyfield fight at the bar. Valastek was also drinking heavily and later passed out that night (III 114-6). Valastek said the morning after Mr. Garcia talked about the mission at the bar on the night of the fight, he heard about the shooting of the girl. However, Valastek was surprised to find out that the first Tyson-Holyfield fight was not on the night of October 12-13, 1996, but a month later, November 9, 1996 (III 129-31).

Valastek gave a custodial statement to police on January 13, 1997 (III 118-20). He said in the statement that he heard Kato and Sonic talking about the shooting, but never mentioned that he heard about the shooting from Mr. Garcia or that Mr. Garcia praised anyone for it (III 122-4). Valastek admitted he overheard officers saying they wanted to get evidence on Mr. Garcia (III 129). He also admitted that in prior testimony, he said he did not hear anyone talking before the murder occurred about things that led up to the murder, because he was drinking heavily, that "I don't know nothing." He also admitted that when asked what, if anything, Mr. Garcia said about the shooting, he said, "I really don't recall him saying. It wasn't him that was saying something about it. It was other people." (III 126-9, 146-9, 154-5).

On redirect, Valastek said there were a number of nights when they would be at the bar when sporting events were on, and maybe he was confused as to the night of the Tyson fight (III 142-4). However, on re-cross, he said that he was telling the truth to the best of his memory when he said that the mission was the same night as the Tyson-Holyfield fight (III 146-9, 154-5).

When the prosecutor asked Brian Weaver how he would characterize discussions Cobras had about rival gangs, and Weaver started to answer that they would discuss maybe going on a mission, defense counsel objected, and the court told the prosecutor to use caution. The prosecutor, however, then went on to elicit that a mission could entail different things, such as a drive-by, a firebombing, or one to go kill someone. Weaver said one was not supposed to do a mission without Mr. Garcia's approval, and if someone did, they would get a violation. He did not think that anyone failed to do a mission they were told to do (III 165-6, 172, 183-3).
        * * * *

Richard "Viper" Hagerman testified that he was First Sergeant of the Cobras, who oversaw the Cobras on the east side of Detroit (III 187, 191). When the prosecutor asked Hagerman when he became reacquainted with Mr. Garcia – whether it was in person or through some other person or letter or phone – Hagerman answered "That was in '96, not soon after he got out of prison" (III 193). He said everyone in the gang answered to Mr. Garcia (III 193-4). Hagerman said "the Table," made upon of all ranked members, would vote on decisions, but that Mr. Garcia had final say (III 197; IV 99-100). Hagerman said that at meetings, people would discuss problems, and whether and how they would handle it, such as by firebombing or drive-by. Hagerman said Mr. Garcia had the final say as to how to handle problems (III 198-9). Defense counsel objected to this line of questioning, which the court sustained (III 199).

Hagerman said in the fall of 1996, a group of Cobras went to a bar. They later returned to Chopin ST. (III 202-4). Hagerman said David "Sonic" Eddleman was very intoxicated, and Mr. Garcia got mad because there was a rule that ranked members should not get drunk to the point of confusion. Hagerman said instead of a "V", Mr. Garcia said Eddleman would have to go on a mission (III 204-6; IV 3-4). "Dark Man" said he knew where some Street Boys were. Hagerman said Mr. Garcia said to go handle it, and "Kato," "Dark Man" and "Sonic" went to the apartment upstairs and got an M-1 carbine (III 206-9; IV 4). Hagerman said the three got into a little red car, and that he, Jerry Estep, and Gabby "Kadahfi" followed in Hagerman's gray '96 Sebring two-door "to make sure that we heard some shots, because they had problems before with people just driving down the street and shooting in the air." The went to the location, but no Street Boys were there, so they returned to Chopin St. (III 209-11; IV 3-4).

Hagerman said once they got back to Chopin St., Mr. Garcia sent Kato, Sonic, and Brian "Gizmo" Babbitt back on a mission. They left in the same car they had been in before. Kato was driving, Sonic the front passenger. Hagerman followed in his car, with Kadahfi. At some point, the car pulled over and Gizmo got into Haberman's car (IV 6-9). Kato drove to Trenton St. Hagerman said he was a car length behind him. He said near Trenton and Kirkwood there was a car, like a Tracker [small SUV], which was parked in the middle of the street, with a lot of people around it. Hagerman said all the people started running toward Kato and Sonic's car (IV 9-10). Hagerman backed up and made a left onto a side street. Kato made a left into the alley off Trenton. Hagerman lost sight of the other car until he

7

saw it at the other end of the alley. The car was coming toward him. Then it stopped. Hagerman said he heard three shots, and the car started backing up the alley back toward Trenton St. (IV 10-2). He said he then heard 5 or 6 more shots coming from down by Trenton St. On the way back to Chopin, he said he heard another 15 shots, but could not tell where they came from (IV 12-4). Hagerman said that Kato and Sonic arrived at Chopin shortly after he did. He said Sonic came up on the porch, said he "lit some flakes up," and that Mr. Garcia basically gave a smile and a nod (IV 15-7).

    \* \* \* \*

On cross-examination, Hagerman admitted he was previously convicted in 1997 of obstruction of justice (IV 66-7). He admitted that before Mr. Garcia came into the picture, he was the unofficial Cobra leader on the east side, and "Sonic" was among those who followed him. He oversaw the east side Cobras at the time of the shooting (IV 56-9, 63-6).

Hagerman said when Sonic and Kato went on the mission, he knew they were going to do a drive-by shooting. His role as tail car was to make sure that shots were heard and that the mission was completed. Although he participated in the mission, he was never charged as an accessory to murder. He denied there was any agreement or understanding that if he testified against Mr. Garcia he would not be charged. He said he did not have immunity or any deal for his testimony from the state, but did have immunity for things he testified to before a federal grand jury (unless he killed someone or ordered a killing) (IV 54-5, 60-2, 113-4, 122).

Right after Hagerman posted bond on January 28m, 1997, he gave a statement to police. Hagerman admitted he lied in the statement (IV 47-9). He said he lied because he was trying to protect David Eddleman. However, he implicated Mr. Garcia in that statement (IV 78, 81-4, 114-6). Hagerman also told Eddleman in a January 1988 letter that he had a lot to talk to him about in person, but not in a letter, and that he would just have to trust him. Hagerman told Eddleman to stay away from Kato because he was making a deal and said "fuck Chuii" (IV 87-9, 92, 96-7). When defense counsel asked Hagerman if he wrote to Eddleman "Chuii ain't no Cobra or Folk," Hagerman replied "Not after killing Devious." (IV 88).

On redirect, the prosecutor elicited that the letter also said "Let that gang shit go. It will not help. Stay away from Kato. He's making a deal. Fuck Chuii. He killed Devious" (IV 105-6).

Hagerman denied he ever received immunity or any deals from the Wayne County Prosecutor for any state crimes. He admitted he was convicted of obstruction of justice while this was all going on. The prosecutor charged him in three other cases; he pled guilty in one pursuant to a plea bargain, the other two went to trial (IV 111-3). The plea was offered in an armed robbery case. He was allowed to plead to unarmed robbery and was sentenced to a year on tether and five years probation (IV 116-7). He was charged with attempted murder in another case but was found guilty only of reckless discharge of a firearm (IV 119-20).

Ricky O'Neal testified that he first met Mr. Garcia in about 1993 when he was in prison with him in Jackson Parole Camp, part of Jackson Prison. O'Neal was

the leader of the Gangster Disciples gang in prison. O'Neal claimed that he and Mr. Garcia became friendly and "pretty tight" (IV 131-5). O'Neal said after he was transferred from Parole Camp, they would write to each other. He later met up with Mr. Garcia when they were both in "Standish Max." O'Neal claimed they both were in the same unit, "the hole," the whole time there (IV 136-7). O'Neal was eventually transferred to another facility. They had no contact with each other after O'Neal left Standish (IV 138-9).

O'Neal had been serving a 3-to-15 year sentence for unarmed robbery. He was paroled on December 31, 1997, but was arrested less than 6 weeks later, on February 8, 1998, for two counts of assault with intent to rob while armed, as a fourth felony offender (IV 194-6, 200). While in the Wayne County Jail, O'Neal ran into Mr. Garcia, who had been arrested in the present case (IV 139-42). O'Neal claimed that he would often go to the gym to work out, and talk there with Mr. Garcia, Sonic, and Kato about their case. It was mostly Sonic who would talk about it. He said Mr. Garcia talked a few times about the case, but did not say much in detail (IV 143-6). O'Neal said, however, that sometimes when Sonic would say something about the case, Kato or Mr. Garcia would correct him. O'Neal said all of them told him that the girl who was shot was not the target; the only thing Mr. Garcia said was that an innocent girl was shot (IV 146-7). O'Neal said Mr. Garcia told him about an incident where he was at his mother's house, and either the Square Boys or Street Boys shot up the house. O'Neal said Mr. Garcia told him that he ordered a hit on them, and that the girl got shot by accident (IV 148-9). O'Neal could not say when Mr. Garcia allegedly told him that he had ordered the hit (V 51-2).

O'Neal was charged with two counts of assault with intent to rob while armed as a fourth felony offender (V 18). He had written the court asking to fire his court-appointed lawyer and for the court to appoint him a new one from a list he supplied of prominent defense attorneys. O'Neal explained he was "probably drunk" in jail and that other inmates helped him write the letter (IV 200-2; V 19-20). He admitted he was in a "bad way" (IV 204). Although O'Neal was caught near the scene with the proceeds of the robbery, he had filed a motion to suppress the identification, a notice of alibi, and a motion to quash. On June 12, 1998, 10 days before his trial, his motions were heard and denied, and his attorney withdrew his alibi notice (V 20-6, 54).

The next day, June 13, 1998, O'Neal wrote a letter to Prosecutor John O'Hair, stating:

> "I'm writing you concerning the matter of information towards Jesus Garcia. 997211 case. If you are interested you may contact me ASAP. The information that I have should help towards a conviction. I myself start trial on the 22nd of this month. Sir, if you want to discuss this matter any further, I would like to have my attorney present. Hopefully, we can talk about my trial." (V 28-9).

After the letter was sent, police contacted O'Neal, and he gave them a statement (IV 153-4). A plea agreement was eventually reached, entered September 2, 1998, which provided that O'Neal would be allowed to plead guilty to two counts

of felonious assault, and in exchange, the original two counts of assault with intent to rob while armed and fourth felony offender charge would be dismissed. It further provided that O'Neal agreed to testify truthfully as a witness in the present case or any legal proceedings arising out of the case, that he acknowledged that his police statement was truthful, and that he agreed to debrief them further (IV 155-9, 161-3). O'Neal was later sentenced to 1 to 4 years in prison for felonious assault (IV 166; V 39). O'Neal said the prosecutor tried to get the judge to give him more time than that, because he was scared that if O'Neal got out before this case went to trial he would not testify (V 43).

O'Neal was sent to prison and ended up in Muskegon Correctional Facility. On March 9, 1999, Inspector Carlos Clay, who was in charge of monitoring gang activity there, asked O'Neal to look at a letter. Clay asked if he knew who wrote the letter. O'Neal told him that Mr. Garcia had written the letter. O'Neal claimed they had kept in contact by letter at one point and that he recognized the letter as Mr. Garcia's hand (IV 167-70; V 123-5).

Defense counsel objected to the admission of the letter, stating it lacked sufficient authentication as having been written by Mr. Garcia (IV 169-70, 176; V 129). On voir dire, O'Neal stated he did not have any of the letters that Mr. Garcia allegedly sent to him while in prison; he threw them all out when he was paroled. He said Mr. Garcia sent him "several" letters – more than two. He said the prison might have them, as they made copies of letters sent to him (IV 172). He did not recall what years Mr. Garcia sent letters to him. He was in Standish to Baraga Correctional Facilities (IV 176). The letter in question was not addressed to O'Neal, but to "R. Rivera" (IV 173-4). The return address said it was from "A. Washington" (V 82, 116). Although O'Neal claimed Mr. Garcia signed the letter in some way, he said one had to know Spanish and he didn't read Spanish (IV 184). The only distinctive thing O'Neal could remember about Mr. Garcia's writing was that his C's were a little C with the C inside. He said he also remembered the slant of his writing (IV 177-8). When asked by defense counsel if he could tell by the handwriting who it was from, O'Neal repeatedly avoided the question, but said it was from Mr. Garcia. When asked how O'Neal could tell it was Mr. Garcia's writing, O'Neal said "I'm not an analyst. You need a professional for that." (IV 176, 180-1).

> [The trial court denied defense counsel's objection to this evidence].
> * * * *

The letter, to "R. Rivera" at Standish Correctional Facility (IV 187-8), stated in part:

> "The rat's name is Ricky O'Neal a/k/a Smooth or Chi-town. GDs, 35 to 40 years, six foot, black, bald on the sides and grayish hair on top. He isn't involved in my case but is a jailhouse snitch who called my prosecutor to work out a deal on his case to testify against me and the only true Cs who are with me. On my way back from court I took care of my business with them as best I could . . . [b]ut you know how they protect their snitches here . . . I need immediate action through the whole penal system especially since he's a GD 7-4 OG. If I'm

correct he's in Muskegon, MCF. This one cannot get away because it can be dangerous." (IV 189-92).

On cross-examination, defense counsel extensively questioned O'Neal about how desperate his situation was when he contacted the prosecutor and asked for a plea bargain in exchange for incriminating Mr. Garcia (IV 193-206; V 18-43). O'Neal testified that he was still in prison (V 12-3). He had been before the parole board in March or May 1999 but had not been paroled. He denied he might be released after testifying (V 15-6, 46-8).

On redirect, the prosecutor brought out that at sentencing, he asked the court to give O'Neal more time than he received. When O'Neal got sentenced, he hadn't testified yet. O'Neal said once he was sentenced, he was supposed to abide by his plea agreement, but "I didn't have to because I got my time already. I'm in prison. What do I have to come back for." (V 55-6). The prosecutor elicited from O'Neal that he was no longer under court jurisdiction, and that he was free to refuse to testify, to not come to court, or to take the fifth if he wanted to. The prosecutor elicited from O'Neal that his office had no hold on O'Neal anymore, and that the most the judge could do would be to hold him in contempt if he did not testify (V 57-8).

On re-cross, O'Neal admitted he was getting the charges reduced because he agreed to testify against Mr. Garcia (V 63-4). He denied that if he didn't abide by the agreement, the prosecutor could come back to court and set aside the plea and be recharged (V 64).

Sgt. Vicki Close monitored gang activity at Standish Correctional Facility. Raul Rivera, who also went by the name "Don Bird," was a member of the Cobras whom she monitored (V 75). When Close monitored a member, she would read outgoing mail, incoming mail, listen to phone calls, monitor every prisoner around them, who they were corresponding with, and where they were housed. A three page letter came in incoming mail to Rivera on March 8, 1999. She rejected it from being delivered to Rivera, and sent it to prison Inspectors because she believed it contained names of prisoners that hits were placed on. She said when mail is rejected, a hearing is held, and the prisoner has the right to send it to someone outside the prison, which Rivera did. She made and kept a copy (V 77-9, 86). She notified Inspectors at prisons for each person named in the letter, including Inspector Carlos Clay of Muskegon Correctional Facility (V 79-80, 84). The name on the return address was A. Washington # 987074, 570 Clinton St., Detroit. The letter had a March 8, 1999, Detroit postmark (V 82, 88, 116).

Sgt. Rocco Daversa from Wayne County Sheriff's Department, testified that 570 Clinton St. was the address of one of the Wayne County Jails (V 116, 119). He testified there was no inmate registered under the name A. Washington there in March 1999, nor was there any inmate assigned to the number 987074 (V 116-7). Daversa testified that in March 1999, Jesus Garcia was incarcerated in the Wayne County Jail (V 117). Daversa admitted there were no markings on the letter or envelope, or any records from the jail, that would indicate that the letter was actually sent from the Wayne County Jail. He had no information that the letter was sent

11

from the jail or where it was sent from. No special stamp was put on outgoing mail (V 118-21).

      After the prosecution rested (V 135), defense counsel moved for directed verdict, arguing the evidence was insufficient to show first degree premeditated murder or conspiracy, because a drive-by did not necessarily entail an actual intent to kill, but could mean different things, such as shooting at a house (V 135-8). The trial court denied the motion (V 140, 142-3).

      The defense then rested, without calling any witnesses.

Def.'s Delayed Application for Leave to Appeal, in *People v. Garcia*, No. 121461 (Mich.), at 1-19

(footnotes omitted).

C.    *Standard of Review*

      Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

      "[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also, Bell v. Cone*, 535 U.S. 685, 694 (2002). "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also, Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also, Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also, Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not

13

require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Prosecutorial Misconduct (Claim I)*

Petitioner first claims that he was denied a fair trial by O'Neal's testimony that he was not required to testify pursuant to his plea agreement because he had already been sentenced, and thus there was nothing that the prosecutor could do to him if he refused to testify. The Court should conclude that petitioner is not entitled to habeas relief on this claim.[1]

1.      *Prosecutorial Misconduct*

At trial, O'Neal testified that although his original plea agreement with the prosecutor required his truthful testimony, because he had already been sentenced the prosecutor no longer had any way to compel his testimony, and that he was therefore voluntarily testifying. The prosecutor elicited from O'Neal that the prosecutor had wanted O'Neal's sentencing to be delayed for this very

---

[1]Respondent contends that petitioner's claim is barred by petitioner's procedural default in the state court, because petitioner failed to object to the testimony at trial. While this is true, petitioner contends that counsel was ineffective for failing to address this claim. If true, counsel's ineffectiveness could constitute cause to excuse petitioner's default. In turn, counsel's effectiveness requires a consideration of the merits of the underlying claim. Accordingly, and because the result is the same in any event, I proceed directly to the merits.

14

reason. *See* Trial Tr., dated 9/14/99, at 55-56. O'Neal testified that he was "supposed to abide by [the plea agreement], but I don't have to because I got my time already. I'm in prison. What do I have to come back for." *Id.* at 56; *see also, id.* at 64. The prosecutor highlighted this testimony during closing argument. *See* Trial Tr., dated 9/15/99, at 68-70. Petitioner contends that O'Neal's testimony was false, and that he was denied a fair trial by its introduction. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

In *Napue v. Illinois*, 360 U.S. 264, 268-69 (1959) and *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), the Supreme Court held that a defendant's right to a fair trial may be violated where the prosecution deliberately misleads a jury, or allows misleading testimony to go uncorrected, with respect to any promises offered a key prosecution witness in exchange for his testimony. In order to establish a *Napue/Giglio* violation, petitioner must show (1) that there was a promise of aid or leniency by the prosecution, (2) which was undisclosed to the jury, and (3) which may have affected the jury's verdict. *See Zeigler v. Callahan*, 659 F.2d 254, 263 (1st Cir. 1981).

Here, petitioner cannot show that O'Neal's testimony was false. There is no dispute that O'Neal testified that he had been given a deal in exchange for his testimony, or that the terms of that deal were fully explained to the jury. Petitioner contends only that O'Neal's testimony that he could no longer be made to abide by the terms of the agreement because he had already been sentenced was false. This is not the case.

First, there is a serious question as to whether, as a matter of the double jeopardy protections of the United States Constitution, the prosecutor could have sought to rescind O'Neal's plea agreement based on his breach after he had already been sentenced. In *Ricketts v. Adamson*,

15

483 U.S. 1 (1987), the Court noted a double jeopardy problem in such a case, but found that the defendant there had waived any double jeopardy claim because the plea agreement explicitly provided that, if the defendant breached the agreement, the agreement would be null and void and the original charges would be reinstated. *See id.* at 9-10. Where, however, the plea agreement contains no such language, the reinitiation of the dismissed charges based on a breach would run afoul of the Double Jeopardy Clause. *See United States v. Alvarez*, 66 F. Supp. 2d 1295, 1305 (S.D. Fla. 1999); *Dyer v. State*, 34 P.2d 652, 653 (Okla. Ct. Crim. App. 2001). Here, there is no indication that O'Neal's initial plea contained such a provision which would waive the double jeopardy issue. *See Garcia*, 2002 WL 499458, at *2 n.2, slip op. at 2-3 n.2 (explaining that, although agreement itself was not part of record, prosecutor read terms of agreement and did not state that there was agreement that the plea could be rescinded after sentencing if O'Neal failed to cooperate).

Second, even apart from federal constitutional concerns, the court of appeals held that O'Neal's testimony was correct as a matter of state law. The court explained:

> There is nothing in Michigan's court rules that provides for withdrawal of a plea agreement by a prosecutor after sentencing. Pursuant to MCR 6.310(C), a prosecutor can move to "vacate a plea before sentence is imposed if the defendant has failed to comply with the terms of a plea agreement." This language "suggests that withdrawal after the sentence on this ground may not be permissible."

*Garcia*, 2002 WL 499458, at *2, slip op. at 2 (quoting 1A GILLESPIE, MICHIGAN CRIMINAL LAW & PROCEDURE (2d ed.), § 16.33, p. 119) (footnoted omitted).

This conclusion was fully consistent with Michigan law. For example, in another unpublished decision the Michigan Court of Appeals rejected a similar claim, explaining that "[t]he informant's obligation under his plea agreement to testify in this case effectively ended at

16

the time he was sentenced." *People v. Word*, No. 187214, 1997 WL 33344051, at \*2 (Mich. Ct. App. Aug. 22, 1997) (per curiam).  The court explained that although Rule 6.310(C) authorizes the prosecutor to seek to vacate a plea before sentence is imposed, under state law "the trial court lacks authority to set aside a valid sentence once the defendant begins serving it."  *Id.* at \*2, n.1. In support of this contention, the *Word* court cited to MICH. CT. R. 6.429(A), which explicitly provides that a "court may not modify a valid sentence after it has been imposed except as provided by law."  *See also, People v. Wybrecht*, 222 Mich. App. 160, 166-67, 564 N.W.2d 903, 906 (1997) (noting that Rule 6.429(A) "codifies the well-settled principle that the trial court lacks authority to set aside a valid sentence once the defendant begins serving it," that such an action by the trial court would infringe upon the executive's powers regarding commutation and parole, and that therefore "absent a tangible legal or procedural error that makes the sentence invalid, the trial court cannot alter a sentence that a defendant has begun to serve.").  And, these expressions of state law are binding on this Court in analyzing petitioner's habeas claims.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Maynard v. Lockhart*, 981 F.2d 981, 986 (8th Cir. 1992).

In short, O'Neal's testimony that the prosecutor could no longer force his cooperation through the plea agreement was probably correct as a matter of federal constitutional law, and was certainly correct as a matter of state law relating to pleas and sentencing.  Thus, petitioner has failed to demonstrate that the prosecutor elicited any false testimony from O'Neal, and petitioner is accordingly not entitled to habeas relief on this claim.

2.     *Ineffective Assistance*

Petitioner also contends that his trial counsel was constitutionally ineffective for failing to object to this testimony.  The Michigan Court of Appeals rejected this claim, explaining: "Having

17

not shown that the testimony was in error, defendant cannot establish that counsel was ineffective for failing to object to its introduction or the prosecution's reference to it in its closing argument." *Garcia*, 2002 WL 499458, at *2, slip op. at 3. This conclusion was a reasonable application of clearly established federal law. *See Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995) (counsel not ineffective for failing to raise meritless objection); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993) (same). Accordingly, petitioner is not entitled to habeas relief on his ineffective assistance of counsel claim.

E.     *Evidence Claims (Claims II & III)*

Petitioner next challenges that admission of various evidence at his trial. In his second claim, petitioner contends that he was denied a fair trial when O'Neal was permitted to authenticate a letter which handwriting experts could not positively conclude was written by petitioner. In his third claim, petitioner contends that he was denied a fair trial by the introduction of evidence that he had committed other crimes and that he had been in prison. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing

18

whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also, Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

### 2. *Authentication of Letter*

Petitioner first contends that he was denied a fair trial when O'Neal was allowed to testify that the letter written to "R. Rivera" by "A. Washington" was written by petitioner. Specifically, he argues that the introduction of the letter denied him a fair trial because O'Neal was not qualified to identify petitioner's handwriting, particularly in light of the fact that a police expert could not do so. Considering petitioner's argument that the letter was not properly authenticated under MICH. R. EVID. 901, the Michigan Court of Appeals rejected petitioner's claim, reasoning that O'Neal's

19

testimony that he was familiar with petitioner's handwriting and that the letter appeared to be written by petitioner. The court concluded that this was sufficient to authenticate the letter under Rule 901, and that "[t]he weight of the evidence was a question for the trier of fact." *Garcia*, 2002 WL 499458, at *3, slip op. at 3. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

As the Michigan Court of Appeals held, the letter was properly admitted under Michigan law. Rule 901 explicitly provides that a document may be authenticated by "[n]onexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation." MICH. R. EVID. 901(b)(2). Petitioner has not shown that this otherwise properly admitted evidence was so unreliable that its admission denied him a fair trial. The letter was relevant to show a consciousness of guilt, and the reliability of O'Neal's testimony and the weight to assign to the letter  issues fully explored by petitioner's counsel on cross-examination—were the province of the jury. Accordingly, the court should conclude that petitioner is not entitled to habeas relief on this claim.

### 3.    *Other Acts Evidence*

Petitioner next claims that he was denied a fair trial by the introduction of evidence of other crimes and evidence that he had previously been in prison. Specifically, petitioner points to several references to his prior imprisonment, testimony that he allegedly killed a fellow gang member, and testimony suggesting that he had ordered other drive-by shootings. The Michigan Court of Appeals concluded that petitioner was not entitled to relief on these claims. Specifically, the court concluded that: (1) "[t]he testimony referring to defendant's prior testimony was necessary to provide context for O'Neal's testimony"; (2) the testimony relating to the killing of another gang member was

20

initially an unsolicited response from a witness, additional references were made "in the heat of vigorous cross-examination by defense counsel," and that any prejudice resulting from this testimony "was diminished by a stipulation that defendant was never charged with the alleged killing"; and (3) through the testimony of other drive-by shootings, "the prosecutor was attempting to show the extreme ultimate control exercised by defendant over the gang membership, which was relevant to convincing the jury that defendant was legally responsible for a shooting committed by someone else." *See Garcia*, 2002 WL 499458, at *3, slip op. at 3-4. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974). Further, there is no clearly established Supreme Court precedent prohibiting the introduction of such evidence, and thus the admission of this evidence was not contrary to, or an unreasonable application of, clearly established federal law upon which habeas relief may be granted. *See Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Lesser Included Offense Instruction (Claim IV)*

Finally, petitioner contends that he was denied a fair trial by the trial court's refusal to instruct the jury on felonious assault as a lesser included offense of first degree murder, and on conspiracy to commit felonious assault as a lesser included offense of conspiracy to commit murder.

21

The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.   *Clearly Established Law*

In order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57 F.3d 1419, 1429-30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct criminal appeal). As the Supreme Court noted in *Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). If an instruction is ambiguous and not necessarily erroneous, it can run afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & 73 n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990). In short, instructional errors of state law will rarely form the basis for federal habeas corpus relief. *See Estelle*, 502 U.S. at 71-72.

2.   *Analysis*

The Court should conclude that petitioner is not entitled to habeas relief on this claim. Although the Eighth Amendment and the Due Process Clause require that a trial court instruct the jury on lesser included offenses in the context of a capital case, *see Beck v. Alabama*, 447 U.S. 625, 637-38 (1980) (trial court required to instruct *sua sponte* on lesser included offenses where the failure to do so would result in the jury being given an "all or nothing" choice of convicting on the

22

capital charge or acquitting the defendant), "the Constitution does not requires a lesser-included offense instruction in non-capital cases." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001). As the Sixth Circuit has noted, even where a lesser offense instruction is requested, the failure of a court to instruct on a lesser included or cognate offense in a non-capital case is generally "not an error of such magnitude to be cognizable in federal habeas corpus review." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc). Indeed, the Michigan Court of Appeals's conclusion that petitioner's lesser included offense instructions were not warranted based on the evidence presented ends the matter, because when a state court has "reviewed a defendant's request for a lesser included offense instruction and concluded that it was not warranted by the evidence elicited at trial, that conclusion is axiomatically correct, as a matter of law." *Bagby*, 894 F.2d at 795.

At a minimum, there is no clearly established Supreme Court law which requires the giving of a requested lesser offense instruction in the non-capital context, as is required for habeas relief under § 2254(d)(1). *See Samu v. Elo*, 14 Fed. Appx. 477, 479 (6th Cir. 2001); *Adams v. Smith*, 280 F. Supp. 2d 704, 717 (E.D. Mich. 2003) (Tarnow, J.). Thus, the Michigan Court of Appeals's resolution of this claim was not contrary to, or an unreasonable application of, clearly established federal law, and petitioner is therefore not entitled to habeas relief on this claim.

G.   *Conclusion*

In view of the foregoing, the Court should conclude that the Michigan Court of Appeals's resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.   NOTICE TO PARTIES REGARDING OBJECTIONS:

23

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Paul J. Komives

PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: March 29, 2005